R.A. Benefield appeals from the trial court's May 11, 2007, judgment finding that he did not have standing to enforce The Commercial Bank of Ozark's revived mortgage interest in certain property and determining the redemption price of the property to be $114,331.79.
 Procedural History
Benefield purchased certain real property at a foreclosure sale on March 14, 2005. On February 21, 2006, James B. Graham filed a complaint seeking to enforce his statutory right of redemption of the real property previously sold at the foreclosure sale. Graham contemporaneously tendered to the trial court $114,645.68. On February 13, 2007, the trial court conducted a hearing at which it heard disputed, oral testimony and admitted 11 exhibits. On March 15, 2007, the trial court entered an order setting the redemption price at $125,474.26. On March 19, 2007, Graham timely filed a postjudgment motion pursuant to Rule 59, Ala. R. Civ. P., seeking to alter, amend, or vacate that judgment. On April 6, 2007, Benefield timely filed a post-judgment motion pursuant to Rule 59, Ala. R. Civ. P., seeking to alter, amend, or vacate that judgment. On May 11, 2007, the trial court amended the judgment, setting the redemption price at $114,331.79. In all other respects, the trial court denied the parties' postjudgment motions. On June 21, 2007, Benefield timely appealed to the supreme court. This case was transferred to this court by the supreme court, pursuant to § 12-2-7(6), Ala. Code 1975.
 Facts
Robert E. Turner and Edith L. Turner were the initial mortgagors of the real property at issue. The Commercial Bank of Ozark ("the bank") was the mortgagee. The bank foreclosed on the mortgage and conducted a foreclosure sale on March 14, 2005. Benefield purchased the real property at the foreclosure sale for $98,049.48. *Page 719 
After the foreclosure sale, there was still a remaining principal balance on the mortgage, as well as interest owed. The principal balance after the sale of the property was $183,844.18, and the interest owed was $77,858.06. The interest accrued at a rate of $40.29 per day. It is undisputed that Benefield owned no interest in the mortgage-deficiency debt and that the bank owned that debt. The bank did not assign or transfer that debt to Benefield.
On October 1, 2005, the Turners assigned to Graham their statutory right of redemption. At some time before November 18, 2005, Graham contacted Benefield to provide notice that he had been assigned the Turners' statutory right of redemption.
On November 16, 2005, the bank notified counsel for Benefield, James R. Fuqua, via correspondence, that "the principal balance remaining after sell [sic] of collateral is $183,844.18. The interest owed to date is $77,858.06 with a per diem of $40.29462."
On November 18, 2005, Fuqua, on behalf of Benefield, presented to Graham correspondence outlining what Benefield contended were lawful charges pursuant to § 6-5-253, Ala. Code 1975. In that correspondence, Fuqua asserted that Benefield was due a total amount of $111,403.33. The November 18, 2005, correspondence also stated that, in addition to the lawful charges,
 "there is an outstanding deficiency balance under the mortgage that was foreclosed on owed to the Commercial Bank. Further, you will be receiving another demand by the Commercial Bank for the deficiency balance which they are due according to the case law of funds that were owed under the note and mortgage, said letter will follow from me on behalf of the Commercial Bank. Once my client, R.A. Benefield, is paid the above sum by certified funds within ten (10) days of the date of receipt of this response, and the Commercial Bank has received the funds which they will demand by their separate letter for the deficiency balance, then my client will sign the necessary documents to convey title to your client."
On November 23, 2005, Fuqua advised Graham via correspondence that he also represented the bank concerning the deficiency balance owed after the foreclosure sale. That correspondence requested that Graham pay the bank $261,984.30 and stated that the daily interest rate was $40.29.
On January 31, 2006, Robert Brogden, attorney for the bank, sent correspondence to counsel for Graham, stating:
 "You had called me and stated that Jimmy Graham had been to see Charlie Harper [(president of the bank)] with reference [to] the redemption of the . . . Turner property. You stated that Charlie had told him that, if he paid Alan Benefield all that was due him, the bank would accept $15,000.00 in allowing the redemption.
 "I have called Charlie and confirmed that. As long as you pay whatever is necessary to Alan to redeem, the bank will then accept $15,000.00 and allow the redemption by [Graham]."
On February 3, 2006, Graham sent a written demand to Benefield seeking a statement of debt and lawful charges pursuant to § 6-5-252, Ala. Code 1975. On February 10, 2006, Benefield timely provided a statement demanding $114,291.10, the amount that he contended to be the debt and lawful charges. On February 15, 2006, Graham responded, disputing whether several items that Benefield claimed as lawful charges were, in fact, charges relating to permanent improvements. On February 21, 2006, Graham tendered to the trial court $114,645.68 and filed a petition *Page 720 
seeking to establish the redemption price of the real property.
On February 23, 2007, the trial court conducted a hearing at which it heard disputed, oral testimony and admitted 11 exhibits. Graham, Benefield, and Larry Ezell, a senior vice president of the bank, testified.
Graham testified that he had negotiated with the bank and its counsel, Robert Brogden, regarding the mortgage-deficiency debt. Graham testified that he met with Charlie Harper, president of the bank, and that they had agreed that the bank would accept $15,000 in satisfaction of the deficiency balance owed for the real property. Graham paid $15,000 to the bank and satisfied the deficiency debt.
Graham disputed the charges claimed by Benefield. Graham testified that he disputed the charges claimed by Benefield for "bush-hogging" on the basis that "bush-hogging was not a permanent improvement." Graham also disputed whether the seed, fertilizer, corn, mineral blocks, fish food, and labor to clean the area around the pond, which were listed as lawful charges, were permanent improvements to the property.
Benefield testified that he had purchased the property at the foreclosure sale for approximately $98,000. When he purchased the property, he believed that the deficiency balance would have to be paid in full in order for a redemptioner to redeem the property, and he "felt very comfortable that the debt owed plus the purchase price of the land far exceeded any value of the land." Benefield admitted that the bank had not ever offered to assign to him the deficiency balance. Benefield testified that he did not want to transfer the property to anyone and had seen no reason to do so thus far.
Benefield testified that in November 2005 Graham notified of him of Graham's intent to redeem the property. He responded with a demand of debt and lawful charges on November 18, 2005, claiming the purchase price plus interest, as well as "80 hours at $60 an hour bush-hogging and tractor work, cost of seed, fertilizer, corn, mineral blocks, and fish food, and labor to clean the area around the banks of the ponds, for a total of [$]111,403.33." On February 10, 2006, Benefield updated his demand of debt and lawful charges to include charges for additional work and interest. The new amount totaled $114,291.10.
Larry Ezell, a senior vice president of the bank, confirmed that, as of November 16, 2005, the deficiency balance of the mortgage after the foreclosure sale was $183,844.18, that the interest owed at that time was $77,858.06, and that the interest rate was $40.29 per day. Ezell confirmed that Graham had paid to the bank $15,000 to satisfy the mortgage-deficiency balance. Ezell testified that the Turners had declared bankruptcy and that the bank had failed to assert its interest in the deficiency balance and interest owed in the bankruptcy action. Ezell testified that, although he had provided Fuqua with the amount of the deficiency balance and interest, he had not authorized Fuqua to attempt to collect that debt on behalf of the bank.
 Standard of Review
The trial court heard ore tenus testimony from three witnesses.
 "Under the ore tenus rule, the trial court's findings of fact are presumed correct and will not be disturbed upon appeal unless these findings are `plainly and palpably wrong or against the preponderance of the evidence.' Ex parte Cater, 772 So.2d 1117, 1119 (Ala. 2000). *Page 721 
However, `[t]he ore tenus rule does not extend to cloak a trial judge's conclusions of law . . . with a presumption of correctness.' Eubanks v. Hale, 752 So.2d 1113, 1144-45 (Ala. 1999). Thus, the court's legal conclusions are subject to de novo
review."
Shealy v. Golden, 897 So.2d 268, 271 (Ala. 2004).
 Analysis
On appeal, Benefield first asserts that the trial court erred by failing to order Graham to pay to the bank the total amount of the mortgage-deficiency debt. In support of this argument, Benefield insists that this court must read §§ 6-5-253(b) and6-5-248(d) in pari materia, in conjunction with pertinent caselaw, to require Graham to pay the entire amount of the deficiency balance owed to the bank. Benefield argues that transferees are expressly excluded from § 6-5-253(b), which provides that "judgments, mortgages, and liens revived
pursuant to [§] 6-5-248(d) are not lawful charges" if the redeeming party is "the debtor, mortgagor, their respective spouse, children, heirs, or devisees," but are included in § 6-5-248(d) as a party against whom recorded mortgages and liens are revived, and that Graham, as a transferee, must pay the entire deficiency debt to the bank to redeem the property. Benefield is incorrect.
The Supreme Court of Alabama has stated:
 "The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute. Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect."
IMED Corp. v. Systems Eng'g Assocs. Corp.,602 So.2d 344, 346 (Ala. 1992).
Section 6-5-253(a), Ala. Code 1975, provides:
 "(a) Any one entitled and desiring to redeem real estate under the provisions of this article must also pay or tender to the purchaser or his or her transferee the purchase price paid at the sale, with interest at the rate allowed to be charged on money judgments as set forth in Section 8-8-10 (as it is now or hereinafter may be amended), and all other lawful charges, also with interest as aforesaid; lawful charges are the following:
 ". . . .
 "(4) Any other valid lien or encumbrance paid or owned by such purchaser or his or her transferee or if the redeeming party is a judgment creditor or junior mortgagee or any transferee thereof, then all recorded judgments, recorded mortgages and recorded liens having a higher priority in existence at the time of sale which are revived under Section 6-5-248(c).
 "If the redemption is made from a person who at the time of redemption owned the debt for which the property was sold, the redemptioner must also pay any balance due on the debt, with interest as aforesaid thereon to date."
(Emphasis added.)
It is undisputed that Benefield was not "a person who at the time of redemption owned the debt for which the property was sold." Moreover, it is undisputed that the bank owned the mortgage-deficiency debt. Benefield was merely the purchaser of the property at the foreclosure sale. *Page 722 
In Southeast Enterprises, Inc. v. Byrd, 720 So.2d 873
(Ala. 1998), the Alabama Supreme Court interpreted § 6-5-253
as it applied to junior mortgagees. In SoutheastEnterprises, Inc. v. Byrd, Southeast Enterprises, Inc. ("SEI"), a junior mortgagee, sought to redeem real property from purchasers at a foreclosure sale. Among other things, SEI argued that it was not required to include in the redemption price the balance remaining on a higher priority mortgage. The supreme court stated:
 "After real property is sold at a foreclosure sale to pay the encumbrances on it, various parties may redeem that property from the purchaser by paying the appropriate redemption price. Ala. Code.1975, § 6-5-248. The redemption price includes taxes, the value of improvements, and certain outstanding encumbrances. Ala. Code 1975, § 6-5-253. The cases cited by SEI interpreted the language of former § 6-5-235:
 "`(3) Any other valid lien or incumbrance paid or owned by such purchaser or his vendee, or any mortgagee of the purchaser to the extent of the amount necessary to redeem.'
"(Emphasis added.) This language plainly required the redeeming party to pay only those encumbrances `paid or owned' by the purchaser.
"In 1988, however, the Legislature repealed § 6-5-235 and replaced it with § 6-5-253, which, in subsection (a), provides that the redemption price now includes:
 "`(4) Any other valid lien or encumbrance paid or owned by such purchaser or his or her transferee or if the redeeming party is a judgment creditor or junior mortgagee or any transferee thereof, then all recorded judgments, recorded mortgages and recorded liens having a higher priority in existence at the time of sale which are revived under Section 6-5-248(c).'
 "(Emphasis added.) See Ala. Acts 19[8]8, Act No. 88-41, § 7, p. 647; see also Harry Cohen, The Statutory Right of Redemption in Alabama: A New Statute is on the Horizon, 39 Ala. L.Rev. 131 (1987) (discussing the then-proposed bill that was later adopted as Act No. 88-441). Unlike its predecessor, § 6-5-253(a)(4) divides encumbrances into two categories: (1) those encumbrances `paid or owned' by the purchaser; and (2) all encumbrances of higher priority. The change in language effected by the 1988 amendment reflects the Legislature's intent to change the computation of the statutory redemption price from that described in St. Clair Indus.[, Inc. v. Harmon's Pipe Fitting Co., 282 Ala. 466, 213 So.2d 201 (1968)], Fonde [v. Lins, 259 Ala. 553, 67 So.2d 834 (1953)], Stewart [v. Stephenson, 243 Ala. 329, 10 So.2d 159 (1942)], and Estes [v. Johnson, 234 Ala. 191, 174 So. 632 (1937)]. The change added to the redemption price paid by junior creditors `all' higher-priority encumbrances, whether or not they are owed by the purchaser. See Ex parte Sizemore, 605 So.2d 1221, 1227 (Ala. 1992) (`Having examined the statute [as it read both before and after] the 1986 amendment, we conclude that the legislature could not have been merely reiterating the law as it existed [before the amendment] without meaning to change the interpretations given to the [preamendment statute.]').
 "The change effected by § 6-5-253(a)(4)'s inclusion of `all' higher-priority encumbrances in the redemption price was clearly intended to prevent financial windfalls to junior creditors. See City of Birmingham v. Hendrix, 257 Ala. 300, 307, 58 So.2d 626, 633-34 *Page 723 
(1952) (stating that a court may ascertain the intent of a statute or of a provision therein by looking to the law as it existed before the statute was enacted). By requiring the redeeming creditor to pay off the first mortgage, § 6-5-253(a)(4) prevents SEI, the junior creditor from vaulting over the holder of the first mortgage, FmHA, to become the possessor of the property. Thus, under § 6-5-253(a)(4), the second mortgagee cannot obtain an interest in collateral that is superior to that of the first mortgagee without compensating the first mortgagee for the first mortgagee's interest."
720 So.2d at 874-75
The supreme court expressly stated that the change in the statute "was clearly intended to prevent financial windfalls to junior creditors." Id. at 875. However, in Garvichv. Associates Financial Services Co. of Alabama, Inc.,435 So.2d 30, 34 (Ala. 1983), the supreme court stated:
 "Under statutory redemption the amount necessary to redeem the property is usually determined by the purchase price at foreclosure sale with . . . interest and all other lawful charges, with legal interest. Code § 6-5-235 (1975). However, when the mortgagee buys at foreclosure sale, the amount of debt secured by the mortgage is treated as the purchase price rather than the amount bid."
"The right of redemption affords a mortgagor `a final eleventh-hour opportunity' to redeem property from foreclosure." Mark S. Dennison, Annotation, Sufficiency of Manner andTimeliness of Redemption of Real Estate Contract fromForeclosure, 66 Am.Jur. Proof of Facts 3d 267, § 4 at 283 (2002). "The purchaser at a foreclosure sale bids and buys property with actual or implied knowledge that it is subject to redemption." Id. at § 4, pp. 283-84.
 "After a mortgage is foreclosed and the property is sold to satisfy the foreclosed mortgage, and within the statutory time period provided by state law, the former property owner whose property was foreclosed, or an assignee, may redeem the property by paying the amount that the property was purchased for at the foreclosure sale, plus interest and costs. Upon discharge of the debt within the maximum permissible time, the foreclosed mortgagor is entitled to have the mortgaged premises released from the mortgage and his entire estate restored to the extent he would have had if the mortgage transaction had never taken place."
Id. at § 4, p. 284. It is undisputed that Benefield received the amount he paid to purchase the property at the foreclosure sale plus interest as well as other lawful charges. Although the mortgage owned by the bank may be revived against Graham pursuant to 6-5-254(d), Benefield has no standing to complain about this issue. To have standing, an individual must allege an injury directly arising from or connected with the wrong alleged. Ex parte James, 836 So.2d 813
(Ala. 2002). The trial court correctly found that Graham was not required to pay the deficiency debt to redeem the property and that Benefield could not enforce the bank's debt. The trial court did not err when it did not require Graham to pay the bank the entire deficiency debt.
Benefield cites Costa Head (Birmingham One), Ltd. v.National Bank of Commerce of Birmingham, 569 So.2d 360
(Ala. 1990), In re McKinney, 174 B.R. 330
(S.D. Ala. 1994), and Shields v. Federal National MortgageAssociation (Civ.A. No. 92-0451-BH, Dec. 14, 1992) (S.D.Ala. 1992) (not published in F.Supp.), for the proposition *Page 724 
that Graham should have to pay the entire deficiency balance to the bank to redeem the property. However, those cases are inapposite and distinguishable. In those cases, mortgagees purchased the property at foreclosure sales. The mortgagees in those cases owned the mortgage-deficiency debts in existence at the time of the foreclosure sales. Here, Benefield was the highest bidder and purchaser at the foreclosure sale, not the bank, the mortgagee who owned the mortgage-deficiency debt. It is undisputed that the bank did not assign or transfer to Benefield its interest in the mortgage-deficiency debt and that Benefield did not own that debt.
Benefield also cites Warren v. Ellison, 250 Ala. 484,35 So.2d 166 (1948), for the proposition that a redemptioner must pay the deficiency balance and interest owed to redeem property. However, in Warren v. Ellison, the supreme court addressed property sold as two distinct parcels at a foreclosure sale. Both parcels had been collateral for a single mortgage. A second mortgage had also been executed, and both parcels of property were again designated as the collateral. Ultimately the first mortgagee acquired the second mortgage.250 Ala. at 486, 35 So.2d at 167. The mortgagor defaulted and the property was foreclosed upon. Id. Warren, a third party to the mortgages, purchased both parcels at the foreclosure sale. Ellison sought to redeem the first parcel of property. However, Warren argued:
 "(1) that statutory right of redemption is a single entity and the mortgagor cannot redeem one of such parcels without redeeming all of the property covered by the mortgages foreclosed; (2) that the mortgage debt secured by the two mortgages, though the mortgages are duly foreclosed, still exists for the protection of the purchaser at the foreclosure sale and he is entitled to be subrogated to the rights of the mortgagee to maintain the unity and compel redemption of both properties."
250 Ala. at 487, 35 So.2d at 168. The supreme court stated that the separate sale of the separate and distinct parcels "destroy[ed] the unity of the debt and the purchase money bid for each parcel is by operation of law credited pro tanto to the mortgage debt and each parcel is thereby discharged from the lien of the mortgage." 250 Ala. at 487, 35 So.2d at 169. In holding that Ellison was entitled to redeem the first parcel, the court noted: "In the absence of a repudiation of the mortgage by the mortgagor or a failure of due foreclosure to pass the title of the mortgagee to the purchaser, the doctrine of equitable subornation is without application."250 Ala. at 488, 35 So.2d at 169. The court noted that the sale of both parcels had raised enough money to pay off the entire mortgage debt. Moreover, the court rejected Warren's second contention. Regardless, in the instant case, there is only one parcel of land; therefore Warren v. Ellison is distinguishable.
Benefield also argues on appeal that the trial court erred by not requiring Graham to pay Benefield interest through the date that the circuit clerk paid to Benefield the money Graham had tendered to the clerk with his petition for redemption.
In its May 11, 2007, order the trial court relied upon Wattsv. Rudulph Real Estate, Inc., 740 So.2d 1085, 1088
(Ala.Civ.App. 1998), for the proposition that a purchaser is entitled to interest until the date of the redemptioner's valid attempt at redemption and is not entitled to interest on the redemption amount for the time during which a dispute has been pending. In Watts this court held that a purchaser at a foreclosure sale was entitled to interest until the date of the redemptioner's valid *Page 725 
attempt at redemption, reasoning: "[A]ny other result would allow a purchaser to profit from his refusal of a valid tender for redemption." 740 So.2d at 1088.
In Nichols v. Colvin, 674 So.2d 576 (Ala.Civ.App. 1995), this court stated:
 "[O]ur supreme court held that a redemptioner's inability to ascertain the amounts necessary for tender or to be paid, his request for the court to ascertain the true amounts owed, and his offer to pay such amounts before insisting on his right to redeem, excused the redemptioner from the tender requirement of the redemption statute. Moreover, our supreme court has held that `[w]hen the statement of lawful charges claimed includes exaggerated or illegal demands, or if so questionable that the redemptioner, acting in good faith, cannot reasonably ascertain the amount he should tender for redemption, no tender need be made before filing a bill to redeem.'"
674 So.2d at 579 (quoting Lavretta v. L. Hammel Dry GoodsCo., 243 Ala. 34, 36, 8 So.2d 264, 265 (1942)).
In his November 18, 2005, correspondence, Benefield's counsel, Fuqua, stated:
 "Once my client, R.A. Benefield, is paid the above sum by certified funds within (10) days of the date of receipt of this response, and the Commercial Bank has received the funds which they will demand by their separate letter for the deficiency balance, then my client will sign the necessary documents to convey title to your client."
Fuqua also sent November 23, 2005, correspondence stating that he represented the bank, outlining the mortgage-deficiency balance, and stating that the bank expected to be paid the deficiency-balance amount after Graham had paid Benefield. However, there was testimony that counsel for Benefield did not represent the bank. Graham testified that he had spoken to Robert Brogden, counsel for the bank, and had discovered that Fuqua did not represent the bank. Ezell did not request that Fuqua demand funds on behalf of the bank. The dispute involved approximately $300,000; the trial court could have easily found that Graham was excused from tender and that Benefield was not due interest during the pendency of the action. Rhoden v.Miller, 495 So.2d 54 (Ala. 1986); Francis v. White,160 Ala. 523, 49 So. 334 (1909); Nichols v. Colvin, supra; and Davis v. Anderson, 678 So.2d 140
(Ala.Civ.App. 1995).
Regardless, Graham contemporaneously tendered to the trial court the entire amount claimed by Benefield (which amount Graham disputed) when he filed his petition for redemption. InBeavers v. Transamerica Financial Services, Inc.,474 So.2d 1105 (Ala. 1985), the supreme court addressed a fact situation in which, although tender was excused, Transamerica tendered payment to the trial court and the funds were placed in an interest-bearing account. The court held that Transamerica was entitled to keep any interest remaining after payment of the redemption price. Id. Here, although there is no interest at issue, Graham tendered the money into court, despite being excused from tender.
Benefield further argues on appeal that the trial court erred by not requiring Graham to pay what Benefield contended to be the lawful charges for permanent improvements, pursuant to § 6-5-253(a). Benefield argues that, because Graham failed to appoint a referee pursuant to § 6-5-254, Ala. Code 1975, he must pay Benefield the value that Benefield places upon the improvements.
Alabama Code 1975, § 6-5-254, titled "[p]ayment of value of permanent improvements; *Page 726 
how value of improvements ascertained," provides:
 "(a) Any person offering to redeem must pay to the then holder of the legal title the value of all permanent improvements made on the land since the sale. . . . In response to written demand made under Section 6-5-252, the then holder of the legal title shall, within 10 days from the receipt of such demand, furnish the proposed redemptioner with the amount claimed as the value of such permanent improvements; and within 10 days of receipt of such response, the proposed redemptioner either shall accept the value so stated by the then holder of the legal title or, disagreeing therewith, shall appoint a referee to ascertain the value of such permanent improvements and in writing notify the then holder of the legal title of his or her disagreement and of the fact and name of the referee appointed by him or her. Within 10 days after the receipt of such notice, the then holder of the legal title shall appoint a referee to ascertain the value of the permanent improvements and advise the proposed redemptioner of the name of the appointee. The two referees shall, within 10 days after the then holder of the legal title has appointed his or her referee, meet and confer upon the award to be made by them. If they cannot agree, the referees shall at once appoint an umpire, and the award by a majority of such body shall be made within 10 days after the appointment of the umpire and shall be final between the parties.
 "(b) If a person offering to redeem fails or refuses to nominate a referee as provided in subsection (a) of this section, he or she must pay the value put upon the improvements by the then holder of the legal title. If the then holder of the legal title fails or refuses to appoint a referee, as provided in subsection (a) of this section, the then holder of the legal title shall forfeit his or her claim to compensation for such improvements. The failure of the referees, or either of them, to act or to appoint an umpire shall not operate to impair or to forfeit the right of either the proposed redemptioner or of the then holder of legal title in the premises; and, in the event of failure without fault of the parties to effect an award, the appropriate court shall proceed to ascertain the true value of such permanent improvements and enforce the redemption accordingly."
(Emphasis added.)
Pursuant to Graham's request, Benefield made a demand for lawful charges pursuant to § 6-5-254, Ala. Code 1975. The record contains two such demands; one is dated November 18, 2005, and the other is dated February 10, 2006. In his February 15, 2006, correspondence, Graham informed Benefield that he was disputing that several items listed constituted permanent improvements and lawful charges.
It is undisputed that Graham did not appoint a referee pursuant to § 6-5-254, Ala. Code 1975. Section 6-5-254(a) requires that "the proposed redemptioner either shall accept the value so stated by the then holder of the legal title or, disagreeing therewith, shall appoint a referee to ascertain the value of such permanent improvements." Graham did not dispute the value of the permanent improvements, but he did dispute whether the claimed charges were, in fact, for permanent improvements and lawful charges.
"[I]f there are charges set forth in the response to the statutory demand that are in dispute in addition to the value of permanent improvements, arbitration is not required as a condition to the commencement of an action." Jesse P. Evans III, *Page 727 Alabama Property Rights Remedies § 35.10[a] (1994); see also Dorrough v. Barnett, 216 Ala. 599,601, 114 So. 198, 200 (1927) (when other charges are thus in dispute, no duty rests upon the redemptioner to name a referee under the arbitration statute as to permanent improvements);Davis v. Anderson, 678 So.2d at 143 (if the redeeming party disputes whether an item listed is a permanent improvement within the meaning of § 6-5-253, then that party is not required to submit the issue to a referee).
In his February 15, 2006, letter, Graham informed Benefield that he was disputing that several items listed constituted permanent improvements. In his petition, Graham alleged that he disputed the charges for items that were not permanent improvements and did not increase the value of the property. Graham also testified that he disputed those same charges. Our supreme court has held that:
 "`[W]hen the statement of lawful charges claimed includes exaggerated or illegal demands, or if so questionable that the redemptioner, acting in good faith, cannot reasonably ascertain the amount he should tender for redemption, no tender need be made before filing a bill to redeem.' Lavretta v. L. Hammel Dry Goods Co., 243 Ala. 34, 36, 8 So.2d 264, 265 (1942); Dorrough v. Barnett, 216 Ala. 599, 601, 114 So. 198, 199-200 (1927). Furthermore, our supreme court has held that if the redemptioner disputes whether an improvement made by the purchaser or his or her transferee is a `permanent improvement' within the meaning of § 6-5-253, the redemptioner need not submit the issue to a referee before filing a complaint to redeem."
Nichols v. Colvin, 674 So.2d at 579; see alsoDorrough v. Barnett, 216 Ala. at 601, 114 So. at 200 ("When other charges are thus in dispute, no duty rests upon the redemptioner to name a referee under the arbitration statute as to permanent improvement."). Benefield's argument that the trial court erred by not requiring Graham to pay the value Benefield assigned to what he contended to be permanent improvements is without merit. Moreover, the dispute regarding the mortgage-deficiency balance, along with the dispute over permanent improvements, excused Graham from the necessity of appointing a referee. Accordingly, we hold that the trial court did not err in that regard.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
THOMPSON, P.J., and PITTMAN and MOORE, JJ., concur.
BRYAN, J., concurs in the result, without writing.